13781

BUSBY v. W. M. RITTER LUMBER CO.

(174 S. E., 4)

Before MANN, J., Jasper, December, 1932.

*Messrs. C. E. Perry, Jr.,* and *Jefferies & McLeod,* for appellant,

*Messrs. H. K. Purdy* and *Padgett & Moorer,* for respondent,

February 15, 1934.

On rehearing April 9, 1934.

The opinion of the Court was delivered by MR. JUSTICE CARTER.

This action, instituted in the Court of Common Pleas for Jasper County, October, 1932, by Alneta Busby, as administratrix of the estate of J. B. Busby. deceased, as plaintiff, for the benefit of herself, widow of the said deceased, and for his minor children, against the W. M. Ritter Lumber Company, defendant, on account of the wrongful death of the said deceased, alleged to have been caused by the willful breach by the defendant of a contract to furnish the said J. B. Busby medical services, is brought under Sections 411 and 412 of the Code of 1932, referred to as Lord Campbell's Act. The defendant answered, interposing a general denial to the allegations of the complaint. Issues being joined, the case was tried at the December, 1932, term of said Court, before his Honor, Judge M. M. Mann, and a jury, resulting in an order of nonsuit, based on defendant's motion. From the order of nonsuit, the plaintiff, pursuant to due notice, has appealed to this Court, asking a reversal of the lower Court.

The facts alleged by the plaintiff, necessary for an understanding of the questions involved in the appeal, briefly stated, are as follows:

The defendant, W. M. Ritter Lumber Company, a corporation, maintains a lumber plant in the said County of Jasper for the purpose of the manufacture and the handling of lumber and the conducting of other business incident thereto, including the cutting and hauling of logs from the swamps and woods to the mill for the purpose of manufacturing the same into lumber; that the said deceased, J. B. Busby, from the early part of the year 1930 to the time he became seriously ill, the latter part of February or the 1st of March, 1932, was engaged in work under the employment of the defendant in connection with the work conducted and carried on in its business at or near its said plant, in the logging and lumber business; that the defendant, in connection with the operation of its said business, undertook and agreed to furnish its employees with competent medical services, for which services the defendant deducted a part of each employee's earnings each pay day; that such contract existed between the defendant and the said J. B. Busby during the month of February, 1932, and the month of March, 1932, and had existed for many months prior thereto, during which time the defendant withheld from the said J. B. Busby "much of his earnings on account of such contract"; that on February 29, 1932, the said J. B. Busby, while engaged in the employment of the defendant as "hammerman" on the pile driver in the logging woods, and "in the course of his employment got thoroughly wet from rain water and swamp water"; that during the night of Monday, February 29, 1932, the said J. B. Busby became ill with a chill and cold, and, although his wife, the said Alneta Busby, did what she could to help his condition, he remained ill and was unable to be out of bed the following day, March 1st; that in the early morning of March 1, 1932, the said Mr. Busby, by and through his brother-in-law, Robert Mc-

Kenzie, notified the defendant at its office at Tillman, S. C., of his very ill condition, and requested that a medical doctor be sent to see him at once; that, although Mr. Busby expected the arrival of a doctor at all times during the day of March 1 (1932), no doctor went to him; that on the morning of the following day, March 2d, Mr. Busby continued ill, and through his said brother-in-law reported to the defendant that the doctor had not visited him, and requested that the defendant send a doctor to see him for an examination and treatment, whereupon the defendant promised to send a doctor to him, and at the same time requested the said Robert McKenzie to notify Dr. C. P. Ryan of the condition of Mr. Busby and request Dr. Ryan to attend Mr. Busby; that Mr. McKenzie, in pursuance thereof, requested Dr. Ryan to attend Mr. Busby, but Dr. Ryan failed and refused to do so; that on the afternoon of the said day, March 2 (1932), Mr. McKenzie, as agent for Mr. Busby, notified the defendant by and through its superintendent that the defendant had not furnished medical attention and treatment to Mr. Busby, and that no doctor had attended him, although he was sick, confined to his bed, and was in great need of medical attention; that on March 3, 1932, of his own accord and upon his own contract, through his said brother-in-law, Mr. McKenzie summoned a doctor to attend him, and it was at that time that it was found that he (Mr. Busby), had contracted pneumonia and pleurisy, "of which pneumonia and pleurisy" Mr. Busby died March 23, 1932; that the pneumonia and pleurisy of which Mr. Busby died was contracted and developed by him during March 1 (1932), and March 2 (1932), and, had he received proper medical attention on those dates, the pneumonia and pleurisy of which he died would have been "evaded, avoided, and nullified and his illness cured"; that, although the defendant had contracted and agreed to furnish competent medical treatment to Mr. Busby, and for many months had appropriated to its own use a great amount of his earnings

therefor, and although the defendant again promised on March 1, 1932, to immediately send a medical doctor to examine and treat him, and although the defendant knew, or ought to have known, that he was relying on the defendant to send a doctor to examine and treat him, yet the defendant, with a conscious indifference to consequences and with utter disregard to the rights of Mr. Busby, carelessly, negligently, recklessly, willfully, and wantonly failed and refused to send a doctor and provide medical treatment for him as it had contracted to do and promised to do. It is further alleged by the plaintiff that she, the widow of the said J. B. Busby, deceased, and her children, referred to in the complaint, for whose benefit the action was instituted, have been deprived of their maintenance, support, and care, for which damages are asked. The specific acts of negligence and willfulness alleged are as follows:

"(a) In failing and refusing to send a doctor and provide medical treatment to J. B. Busby, deceased, as it had contracted and agreed to do.

"(b) In failing and refusing to send a doctor to J. B. Busby, deceased, on March 1, 1932, as it promised to do.

"(c) In failing to send a doctor to J. B. Busby, deceased, on March 2, 1932, as it promised to do.

"(d) In deceiving J. B. Busby, deceased, while he was sick abed on March 1, 1932, and permitting him to forego much needed medical attention relying on the promise of the defendant, W. M. Ritter Lumber Company.

"(e) In deceiving J. B. Busby, deceased, while he was sick abed on March 2, 1932, and permitting him to forego much needed medical attention relying on the promise of the defendant, W. M. Ritter Lumber Company.

"(f) In failing to advise J. B. Busby, deceased, on March 1, 1932, to proceed by means other than through the defendant, W. M. Ritter Lumber Company, to get medical attention and treatment.

"(g) In failing to advise J. B. Busby, deceased, on March 2, 1932, to proceed by means, other than through the defendant, W. M. Ritter Lumber Company, to get medical attention and treatment."

At the close of the plaintiff's testimony, the defendant, by its counsel, made a motion for a nonsuit based on the following grounds:

"The plaintiff has elected to stand on tort claiming the W. M. Ritter Lumber Company breached its duty to the plaintiff by or alleging wilful and wanton conduct, and etc. We submit there has been no proof before the Court showing any legal duty of the defendant toward the plaintiff to furnish the plaintiff medical services.

"We, further, submit may please Your Honor, that there is no proof that the alleged negligent and wilful conduct on the part of the defendant was the direct and proximate cause of the death of the deceased. Consequently, if this case were allowed to go to the jury, the jury, would be permitted to speculate on the effects of the derelicts charged up against the defendant. The plaintiff has not only got to show derelicts on the part of the defendant, but he has got to show the derelicts were the direct and proximate cause of the death of the deceased. We submit there has been a total failure of proof."

The trial Judge refused the motion for nonsuit as to the first ground upon which the same was made, stating, in effect, at the time of his ruling that there was sufficient testimony in support of the alleged contractual relation to take that issue to the jury. We agree with his Honor's holding in this respect. But his Honor sustained the second ground upon which the motion was made and granted a nonsuit for the defendant thereon. With this ruling of the Circuit Judge we are unable to agree. In our opinion, the evidence was sufficient to take the case to the jury, not only as to whether the defendant failed in the alleged contractual relation to furnish efficient medical attention and

service for the deceased at the time in question, but also as to whether such alleged failure was the cause of the death of the deceased as a proximate cause thereof. As to the issue, in our opinion, the evidence was susceptible of more than one reasonable inference, and we therefore think that his Honor should have submitted the issue to the jury.

Since, under our view of the record, the case will have to be remanded for a new trial, we shall avoid entering into a full discussion of the testimony, but refer only to pertinent parts of the same which we think sufficient to show that the case should have been submitted to the jury.

Mrs. Alneta Busby, widow of the deceased, J. B. Busby, stated, in effect, in the course of her testimony, that her said husband died March 23, 1932, leaving herself as his widow and the children named in the complaint, one of the children being born shortly after the death of Mr. Busby; that from the early part of the year 1930 up until the time of his death Mr. Busby had been in the employment of the defendant in connection with the work connected with the said plant referred to in the complaint; that on February 29, 1932, he came home from his work that night with a cold, having been exposed and being wet at the time from rain during the day, his work at that time for the defendant being in the swamp; that she gave him such attention as she could; that on the following morning Mr. Busby was unable to go to his work, and she sent by her brother, Robert McKenzie, to the defendant to send a doctor that day, and in response to what her brother told her, it seems, she expected the doctor to come during that day to see her husband, but that the doctor failed to come; that on the following day her husband was worse, and the doctor again failed to come to see him on that day, which was the 2d of March. Mrs. Busby also testified to the effect that the mill took out as much as 75 cents of her husband's wages on pay days, either every two weeks or once a month, it seems, as compensation for furnishing a doctor for him when needed. She stated that it

was her impression that the money was taken out once a month for this purpose. She also stated that her husband was sick in January prior to his last illness in March, and that during that illness he had been furnished medical attention by the defendant without cost to himself, being attended by Dr. Pinckney Ryan, sent by the defendant. Mrs. Busby further stated that her husband developed pneumonia and that he died March 23, 1932; that at no time during his illness did the defendant send a physician to see him, and that, so far as she knew, no inquiry was made by the defendant about her husband's condition during his illness; that on the 3d of March, after her husband was taken ill on the 29th of February, seeing that his condition had grown worse and the defendant not having sent a physician to see him, she, together with her brother, the said Mr. McKenzie, sent for Dr. Smith to come to see him, and that Dr. Smith called on the afternoon of that day, March 3d, and found that her husband had pneumonia; that Dr. Smith treated her husband for a number of days; that later on Dr. Ritter was called and he also treated Mr. Busby.

Mr. Robert McKenzie, brother-in-law of Mr. Busby, the deceased, testified about the condition and surroundings regarding Mr. Busby's illness and death, stating, in effect, that Mr. Busby was working for the defendant and had been for some length of time; that he saw Mr. Busby when he came home from his work on the 29th of February, 1932; that he was wet and was complaining of being cold and feeling bad, and that on the next morning he was sick and unable to go to his work, not able to get out of bed; that he (Mr. McKenzie), at the instance of Mr. Busby, tried to get the defendant to send a physician to see him. In this connection we quote the following testimony given on the trial by Mr. McKenzie:

"Q. Did he get up out of bed? A. No. sir, he stayed in bed.

"Q. Robert, did he go to a doctor next day? A. No, sir, he tried to get one to come to see him, but he did not come.

"Q. Did you try to get a doctor for him? A. Well, I went to Mr. Jadorn's store to call up the office. I know Mr. Mays, the bookkeeper answered the 'phone. I told him about Mr. Busby being sick and for him to have the doctor to come to see him at once and he said, he would have the doctor to come to see him. So, I thought he would come, and I went back home for he told me that he would have him to come, but he never did come to see him. The next morning I went back up to the same store to call up again, and he told me to call the doctor. I called the doctor who was Dr. Ryan, and he said he was not getting enough money to make a special trip over there. I then saw Mr. Yates at the depot and told him the doctor refused to come to see Mr. Busby. I went on back home, and he never did come. That Tuesday evening I came over to Ridgeland and talked with Dr. Ryan telling him that Mr. Busby was in bad fix and for him to fix me up some medicine for Mr. Busby to take until he was able to come over there. He said, you will have to pay for the medicine for he was not getting enough to give it to me. He said, he had been notified to take him off of his list.

"Q. Did he say who he had been notified by? A. No, sir, I told him he needed some medicine, and I told him I would pay him for it myself. I know I did not have but a dollar with me, and I gave it to him, but he charged me $2.00 for it. I took the medicine back to Mr. Busby, he took about that much of it (witness indicating), and he did not seem to be getting any better. On the 3rd day of March, I called up Dr. Smith asking Dr. Smith to come to see him. Dr. Smith came over to see him, and he said, he had pneumonia. He treated him for about two weeks, I believe, one night we thought he was going to die as well as I can remember somewhere about midnight. I know it was along about midnight somewhere along about the 19th or the 20th, but I think it was the 19th day of March that I tried to get Dr. Smith on

·the telephone, but I could not get him, so I got in my automobile and drove over to Ridgeland. I called up. Dr. Smith but I could not get him to answer. I then went to his house, but he said he could not go. I went on back home; as well as I can remember we got Dr. Ritter the next day and he treated him until the 23rd day of March.

"Q. You say, when you were over to see Dr. Ryan on March 3rd, he charged you for the medicine? A. Yes, sir.

"Q. State whether or not, he would send it on account of the mill? A. No, sir, he did not send it on account of the mill at all. I know I had to pay for it.

"Q. During February and March what days did the doctor regularly visit the mill? A. As well as I can remember it was on a Monday, Tuesday, Thursday and Saturday.

"Q. If the doctor should have gone to the mill as usual on Tuesday how near to Mr. Busby's house did he come? A. I imagine about 100 yards for it was not very far.

"Q. And who was it, you notified on March 1st? A. I called up the office of the W. M. Ritter Lumber Company and Mr. Mays, the bookkeeper answered the 'phone.

"Q. Where is that 'phone? A. The· 'phone is in his office.

"Q. And you notified Mr. Mays? A. Yes, sir.

"Q. About the next day you called again, who did you notify? A. I called the office and Mr. Mays answered the 'phone again.

"Q. Who is Mr. D. R. Yates? A. He was superintendent of the W. M. Ritter Lumber Company.

"Q. You say, he is the superintendent of the W. M. Ritter Lumber Company? A. Yes, sir.

"Q. You notified him, did you not? A. Yes, sir, that afternoon on the 2nd."

As bearing on the question of contractual relation of the defendant to furnish medical services to the deceased, there was introduced in evidence a copy of the following notice which, according to the evidence, was posted in the defendant's place of business:

"Notice      Notice      Notice      Notice

"Until further advised Dr. Ryan will be at the mill at FOUR o'clock on the following days:

Monday      Tuesday      Thursday      Saturday

"Please leave any calls at the office for him to visit patients at their home, any one needing attention and are able to come to the office are asked to do so.

"Any one needing his services at any time other than the above we will call him but request that these calls be as few as possible, your cooperation with the Doctor will be appreciated and we feel more satisfactory service can be rendered to all parties concerned by so doing.

"Kindly take any criticisms of service up with superintendent and every effort will be made to adjust any differences or change the above schedule.

"D. R. YATES, Superintendent."

There was further testimony also on the question of the defendant having collected compensation from Mr. Busby for furnishing a medical doctor in case of illness.

We quote the following testimony given on the part of Dr. C. E. Smith in chief examination:

"Q. Dr. Smith, did you have occasion to treat J. B. Busby during his last illness? A. Yes, sir.

"Q. When did you treat him? A. Along about the 1st of March and my records show the 6th, was the first day that I saw him.

"Q. Your records show the 6th, the first day that you saw him? A. Yes, sir, I could have seen him before for they claim I saw him on the 3rd, but I can not find my record of that in my file.

"Q. What did you find when you first attended him? A. He had pneumonia.

"Q. Did he ever get well? A. I understand not.

"Q. Doctor, when you are first called to a patient, state whether or not, you try to find out the surrounding facts

under which he is ailing in your diagnosis? A. Yes, sir, I do.

"Q. You were called to a patient, you found out that this patient on the day before was exposed to rain, and got wet, and that night he was ill, and had a bad cold and a headache, what treatment would you prescribe for him, doctor? A. Depends largely on the extent of the cold, as for the treatment for the cold for there is no specific treatment. You would give him something for the headache, and if he has fever, you would give him sponge baths.

"Q. Would you put him to bed? A. Yes, sir.

"Q. Doctor, in your experience as a doctor after one exposed how long before pneumonia sets in? A. It would vary from a couple of days, to a week or as much as ten days.

"Q. Doctor, if you find a man suffering from a severe cold who was exposed the day before, is it possible by proper treatment to avoid pneumonia? A. I think it is possible, yes, sir.

"Q. Doctor, in the treatment of pneumonia does your patient have more chances of recovery on getting to him in its early stages than if you are delayed in reaching him? A. Yes, sir, for that is true with most any serious illness."

Dr. A. Ritter who, according to testimony of some of the members of the family, was called in to see Mr. Busby on account of the fact that Dr. Smith could not be located, testified, in effect, that he treated Mr. Busby the last two or three days of his illness which caused his death, and stated that from the diagnosis he made of the case that Mr. Busby died of "pleurisy of an effusion," and further stated that he had no doubt that he had pneumonia at the beginning of his illness. In this connection Dr. Ritter further testified that in the treatment of pneumonia promptness is necessary and essential, and further stated, in effect, that even minutes count.

In this connection we call attention to the fact that Dr. Ritter and Dr. Smith were not sent by the defendant to visit

and attend Mr. Busby, but were called by members of Mr. Busby's family and had to be paid for their services by the widow of Mr. Busby, even though, according to testimony offered on the part of the plaintiff. the defendant had contracted with the deceased to furnish a physician and medical attention for him, and had received compensation from the deceased for that purpose; such compensation having been received by collecting a certain amount out of his wages from time to time. It is true, as contended by respondent, there was no direct testimony offered that the death of the deceased was caused by the defendant not complying with the alleged contract to furnish a medical doctor for the deceased; that is, no one testified that the deceased did die because the defendant failed to comply with such contract, but certainly, according to our view, the testimony was susceptible of more than one reasonable inference on this issue, and, under the recognized rule, the same should have been submitted to the jury, under proper instructions, to determine whether the failure on the part of the defendant, if there was such failure, to comply with the alleged contract to furnish proper medical attention, was the proximate cause of the death of the deceased. There was testimony to the effect that Mr. Busby became ill the second day of his sickness, and grew worse each day following. At least, this is one inference to be drawn from the testimony, and that he and members of his family did what they could to get the defendant to furnish a physician; that, not being able to get the defendant to furnish a physician, he (Mr. Busby), and the members of his family did what they could to get a physician. There was delay, in getting a doctor, of two days, and this is charged against the defendant. There was testimony to the effect that in the treatment of pneumonia and other dangerous diseases prompt action is necessary. Whether the delay in getting medical attention should be charged against the defendant, under the facts and circumstances of the case, and whether such delay in getting

medical attention caused the death of Mr. Busby, and whether the failure to send medical attention at all to Mr. Busby during his illness, in pursuance of the alleged contract between the parties, caused the death of Mr. Busby, as the proximate cause thereof, were, under our view of the testimony, questions for the jury. Of course, it is not for this Court to say what weight should be given to the testimony of the several witnesses in the case, but that is an issue for the jury to determine in the consideration of the case in passing upon all of the testimony in the case, that on the part of the plaintiff and also the testimony on the part of the defendant hereafter to be given when a new trial is had.

The principles of law governing the case are so well known that we deem it unnecessary to cite authorities. We simply call attention to the rule that in passing upon motions for direction of a verdict, as well as for nonsuit, the testimony must be considered and viewed in the most favorable light for the plaintiff.

The decision reached by the Court herein makes it unnecessary to consider the other questions urged by the parties.

The order of the Circuit Judge, in ordering nonsuit for the defendant, is reversed, and the case remanded for a new trial.

MR. CHIEF JUSTICE BLEASE and MESSRS. JUSTICES STABLER and BONHAM concur.

### ORDER ON PETITION FOR REHEARING

*Per curiam.*

The Court having duly considered the petition of the respondent for a rehearing in this case, and being satisfied that it did not in reaching its conclusion overlook any material fact or issue involved in the case, the rehearing asked for is refused, the petition dismissed, and

the order staying the remittitur revoked. However, for the purpose of enlarging upon one phase of the case, the opinion heretofore filed in the case will be amended by adding thereto the following statement:

However, we wish to again call attention to the fact that the trial Judge did not grant the motion for a nonsuit upon the first ground (set out above), upon which the motion was based, but overruled the motion as to that ground. The respondent, upon due notice, has asked this Court to sustain the order of nonsuit upon the ground that the trial Judge should have sustained that ground, also respondent's position being stated thus: "The plaintiff having elected to proceed to trial on a cause of action sounding in tort rather than on contract, thereby waiving any liability of the defendant arising out of contract, and having failed to prove any legal duty resting upon the defendant to furnish her intestate with medical services, the Court should, upon motion made by the defendant, have ordered a nonsuit upon that ground." In this connection respondent calls attention to the fact that, at the commencement of the trial of the case, counsel for the plaintiff, in response to question, stated that the action was an action in tort, and the parties went to trial on that question. As stated above, we agree with his Honor's ruling on this phase of the case. In ruling upon the question, his Honor made reference to the case of *Owens v. Atlantic Coast Lumber Corporation,* which case was twice before this Court, reported in 107 S. C., 425, 93 S. E., 7, and *Id.,* 108 S. C., 258, 94 S. E., 15. In our opinion the case is in point. This action was instituted by Julius Owens, as administrator of the estate of Florence Owens, deceased (who was the wife of Julius Owens), against the Atlantic Coast Lumber Corporation, alleging damages for breach of defendant's contract to provide medical attention to his sick wife, the said Florence Owens, for lack of which she died. In that case this Court held that the case contained only one cause of action, and that it was based on tort; that the ref-

erences in the complaint to the contract were for the purpose of showing the relation between the parties out of which the tort arose. That is the case in the case at bar, and, if the facts alleged are established, the action can be maintained against the defendant. Further, under our view of the record, we think the issues should have been submitted to the jury.

MR. CHIEF JUSTICE BLEASE and MESSRS. JUSTICES STABLER, CARTER and BONHAM concur.